**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| HELEN DAVIS,<br>*Plaintiff,*<br>v.<br>NATIONWIDE CAPITAL SERVICES, LLC, a Nevada limited liability company,<br>*Defendant.* | Case No.<br>2:24-cv-02391-AWM-JBW |

## MEMORANDUM AND ORDER

Defendant Nationwide Capital Services, LLC ("NCS") retained a collection agency to collect a defaulted consumer debt allegedly owed by Plaintiff Helen Davis. In June 2024, Davis disputed the debt in a letter her counsel sent to that agency. The next month, NCS reported the debt to TransUnion, a consumer credit reporting agency, without any indication that it was disputed. Davis sued under the Fair Debt Collection Practices Act ("FDCPA"), and the parties have cross-moved for summary judgment. (Docs. 72, 77.) The motions are fully briefed (Docs. 73, 78, 90) and ripe for decision. For the reasons below, NCS's motion is **denied**, and Davis's cross-motion is **granted in part and denied in part**: Davis has Article III standing; NCS is a "debt collector" under 15 U.S.C. § 1692a(6); NCS is liable as a matter of law under 15 U.S.C. § 1692e(8) (Count I); and NCS's *bona fide* error defense under 15 U.S.C. § 1692k(c) fails. Both motions are denied without prejudice as to Count II (15 U.S.C. § 1692f). The case will otherwise proceed to trial on damages.

## I. BACKGROUND AND PROCEDURAL HISTORY

### A. Uncontroverted Facts.

The following facts are uncontroverted for purposes of the cross-motions, drawn from the parties' statements of material fact under D. Kan. Rule 56.1 and the summary-

judgment record.[1] Where a party failed to specifically controvert a numbered fact with a citation to the record, the Court deems that fact admitted. D. Kan. Rule 56.1(a), (b)(2).

Plaintiff Helen Davis, a Kansas resident, took out a consumer loan from Western Shamrock for personal living expenses.[2] The loan went into default, and NCS, a Nevada limited liability company, purchased the defaulted account.[3] On January 20, 2024, NCS entered into a Collection Service Agreement with Rockland Resource LLC ("Rockland"), a collection agency that had applied for the business ten days earlier, disclosing that it had been formed less than sixty days before—on November 14, 2023—and was still getting some aspects of the business into place, such as insurance and association affiliations.[4] NCS assigned the Davis account to Rockland for collection in February 2024.[5]

The Collection Service Agreement gave NCS extensive rights over Rockland's work on NCS's accounts: weekly collection-activity reports; a cap on Rockland's settlement authority, with discounts above 25% requiring NCS's express permission; the right to audit Rockland's finances, performance, procedures, and data security, including remote computer access to all agency records on NCS accounts; the right to recall any account "for any reason"; and the right to terminate the relationship.[6]

---

[1] The Court cites the parties' Rule 56.1 materials and the summary-judgment record by CM/ECF document, page, and paragraph number: Defendant's statement of material facts (Doc. 73 at 3–4), Plaintiff's responses (Doc. 78 at 2–8), Plaintiff's statement of additional facts (Doc. 78 at 8–11), and Defendant's responses (Doc. 90 at 1–5).

[2] Doc. 78 at 11 ¶ 18; Doc. 80-9, Davis Decl. ¶¶ 2–4; *see* Doc. 90 at 5 ¶ 18 (not disputing the Western Shamrock loan; without information as to citizenship).

[3] Doc. 73 at 3 ¶ 1 (NCS's own statement of material facts). Davis did not admit the purchase, agreeing only that NCS "claims to have purchased" the account. Doc. 78 at 3 ¶ 1. The purchase is NCS's own assertion and the premise of its *Henson* argument, and NCS separately admits its business consists of purchasing and liquidating defaulted consumer debt. Doc. 78 at 8 ¶ 3; Doc. 90 at 2 ¶ 3.

[4] Doc. 78 at 9 ¶¶ 6–7; Doc. 90 at 3 ¶¶ 6–7 (undisputed); Doc. 81 at A000001 (Agreement, reciting a January 20, 2024, Effective Date); Doc. 81-2 at A000015R (formation date), A000018R–19R (errors-and-omissions and cyber coverage and industry memberships listed as pending).

[5] Doc. 73 at 3 ¶ 2; Doc. 73-1, Guadagna Decl. ¶ 6.

[6] Doc. 81, Collection Service Agreement §§ IV–VIII.

Rockland also promised to conduct its collection activity "consistent with the image and reputation of" NCS and to "immediately provide [NCS] with information on any notice received from a 3rd party related to [NCS's] Account(s), including but not limited to: bankruptcy, attorney representation, legal action, receivership or other judicial order."[7] NCS admits it "had the right of oversight and control over the debt collection activity Rockland performed on NCS's behalf."[8]

On March 2, 2024, Rockland sent Davis a collection letter demanding payment of a $3,578.28 balance.[9] The letter stated that Rockland "has been authorized by Nationwide Capital Services to handle your outstanding balance," and that Rockland would "honor requests by email or phone, and for as long as the debt remains within our office."[10]

On June 19, 2024, Davis's counsel at Legal Advocates for Seniors and People with Disabilities emailed Rockland a letter stating, among other things: counsel represented Davis, her income was protected from collection, and she "questions the correctness of the debt(s) you are trying to collect."[11] NCS's Director of Operations, Anthony Guadagna, declares this letter "was never forwarded to NCS."[12] Guadagna also declares Rockland was "temporarily out of business beginning April 12, 2024" and "reopened operations sometime in June 2024."[13] Whatever Rockland's status in the spring, no one disputes Rockland continued attempting to collect the Davis debt on NCS's behalf after June 19, 2024—including collection emails to Davis on July 12, July 19, and August 4, 2024, and

[7] *Id.* § IX.a, d.
[8] Doc. 78 at 9 ¶ 8; Doc. 90 at 3 ¶ 8.
[9] Doc. 73 at 4 ¶ 5; Doc. 78 at 6 ¶ 5; Doc. 1-2.
[10] Doc. 78 at 9 ¶ 9; Doc. 90 at 3 ¶ 9; Doc. 1-2.
[11] Doc. 73 at 4 ¶ 6; Doc. 78 at 6 ¶ 6, 10 ¶ 12; Doc. 90 at 4 ¶ 12; Doc. 1-3.
[12] Doc. 73-1, Guadagna Decl. ¶ 9.
[13] *Id.* ¶ 8.

collection call attempts on August 4, 2024.[14] Neither Rockland nor NCS ever told Davis or her counsel that Rockland was out of business or unable to receive communications.[15] NCS did not recall the account from Rockland until about October 2024.[16]

In July 2024, NCS reported the Davis debt to TransUnion without indicating it was disputed, and the tradeline was never flagged as disputed at any time between March 2 and July 27, 2024.[17] After reviewing her TransUnion credit report on July 27, 2024, Davis had her counsel mail a second dispute letter directly to NCS on August 27, 2024, demanding that NCS stop reporting the debt without noting the dispute.[18] Davis attests that this effort cost her additional time and about $260 in expense, and that NCS's reporting harmed her credit reputation and caused her distress.[19]

As to the nature of NCS's business, the parties stipulated that in 2023 and 2024 more than ninety-five percent of NCS's revenue derived from the purchase and liquidation of accounts characterized as defaulted consumer debts at the time of purchase.[20] Roughly seventy of NCS's eighty employees hold the job role of "debt collector."[21] And in August 2025, NCS entered a consent order with the Tennessee Collection Service Board admitting it had conducted collection activity in that state without the license required of any person who operates a "collection service business."[22] NCS does not dispute any of these facts; it disputes only their legal significance.

---

[14] Doc. 78 at 10 ¶ 12; Doc. 90 at 4 ¶ 12.
[15] Doc. 78 at 10 ¶ 13 (deemed admitted; Doc. 90 at 4 ¶ 13).
[16] Doc. 78 at 10–11 ¶ 15 (deemed admitted; Doc. 90 at 4 ¶ 15); Doc. 81-1 at A000014.
[17] Doc. 78 at 10 ¶ 14; Doc. 90 at 4 ¶ 14; Doc. 73 at 4 ¶ 9; Doc. 78 at 7–8 ¶ 9.
[18] Doc. 73 at 4 ¶ 7; Doc. 78 at 6–7 ¶ 7; Doc. 80-9, Davis Decl. ¶ 8; Doc. 1-5.
[19] Doc. 78 at 11 ¶¶ 16–17 (deemed admitted; Doc. 90 at 4–5 ¶¶ 16–17); Doc. 80-9, Davis Decl. ¶¶ 9–11.
[20] Doc. 78 at 8 ¶ 3; Doc. 90 at 2 ¶ 3; Doc. 80-7 at 2.
[21] Doc. 78 at 8 ¶ 2; Doc. 90 at 2 ¶ 2; Doc. 80-6, Dep. of Anthony Guadagna, NCS's Rule 30(b)(6) designee, taken Jan. 5, 2026, in *Brown v. Nationwide Capital Servs., LLC*, No. 2:25-cv-2274 (W.D. Tenn.) ("Guadagna Dep."), 17:5–18:21.
[22] Doc. 78 at 8–9 ¶ 4; Doc. 90 at 2 ¶ 4; Doc. 80-8 at 4–6; *see* Tenn. Code Ann. § 62-20-105(a).

### B. Procedural History.

Davis filed this action on August 28, 2024—the day after the date of her counsel's second dispute letter—asserting two claims under the FDCPA: failure to communicate that a disputed debt is disputed, 15 U.S.C. § 1692e(8) (Count I), and use of unfair or unconscionable collection means, 15 U.S.C. § 1692f (Count II).[23] NCS answered, asserting, among other defenses, lack of standing and *bona fide* error.[24] NCS then moved to dismiss for lack of Article III standing; this Court denied the motion, holding that Davis's allegations of additional time, effort, and expense spent reasserting her dispute stated a tangible injury in fact.[25]

NCS filed the present summary-judgment motion on January 29, 2026, before the close of discovery.[26] Davis responded and cross-moved on February 26, 2026, and NCS responded to the cross-motion on March 25, 2026.[27] Davis filed no reply. Magistrate Judge Wieland vacated the pretrial conference and related deadlines pending resolution of these motions, and discovery closed on May 28, 2026, under the Amended Scheduling Order.[28] The case was reassigned on June 23, 2026.[29]

## II. LEGAL STANDARD

Summary judgment is appropriate when the movant shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it might affect the outcome of the suit under the

[23] Doc. 1.
[24] Doc. 21 at 4–5.
[25] Doc. 53 at 5–6.
[26] Docs. 72–73.
[27] Docs. 77–78; Doc. 90.
[28] Doc. 92; Doc. 58.
[29] Doc. 93.

governing law, and a dispute is genuine if the evidence would allow a reasonable jury to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The movant bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once that burden is met, the nonmovant may not rest on its pleadings but must come forward with specific facts, supported by admissible evidence, showing a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998).

Where, as with an affirmative defense, the nonmovant would bear the burden of proof at trial, the movant may discharge its initial burden by pointing to an absence of evidence supporting an essential element, at which point the burden shifts to the nonmovant to produce record evidence on each element. *Celotex*, 477 U.S. at 325. Conversely, where the movant will bear the burden of persuasion at trial—as Davis does on her own claim—its showing "must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Leone v. Owsley*, 810 F.3d 1149, 1153 (10th Cir. 2015) (emphasis omitted) (quoting *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986)).

Cross-motions for summary judgment are evaluated independently: "the denial of one does not require the grant of another," *Buell Cabinet Co. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979), and the Court draws all reasonable inferences against the party whose motion is under consideration, *United States v. Kan. Dep't of Health & Env't*, 162 F.4th 1238, 1247 (10th Cir. 2025). On cross-motions, the Court is "entitled to assume that no evidence needs to be considered other than that filed by the parties, but summary judgment is nevertheless inappropriate if disputes remain as to material facts." *Atl.*

*Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000) (quoting *James Barlow Family Ltd. P'ship v. David M. Munson, Inc.*, 132 F.3d 1316, 1319 (10th Cir. 1997)).

Under this District's local rule, a brief in support of or in opposition to summary judgment must begin with a numbered statement of material facts referring "with particularity to those portions of the record" relied on. D. Kan. Rule 56.1(a), (b)(1). Material facts in the movant's statement "will be deemed admitted … unless specifically controverted by the statement of the opposing party." D. Kan. Rule 56.1(a). And material facts in the non-movant's statement of additional facts "will be deemed admitted … unless specifically controverted by the reply of the moving party." D. Kan. Rule 56.1(b)(2). The reply, in turn, must respond to those additional facts "in the manner prescribed in subsection (b)(1)"—by numbered paragraph, referring "with particularity to those portions of the record" relied on. D. Kan. Rule 56.1(c), (b)(1). Davis's statement of additional facts is subject to both provisions: it supports her cross-motion and opposes NCS's motion.[30] Several of NCS's responses to Davis's additional facts do not specifically controvert anything. NCS responds to one fact with a bare "Disputed" unsupported by any record citation,[31] and to others by stating only that it is "without information sufficient to admit or deny."[32] Neither type of response supplies the record citation that Rule 56.1(c) and (b)(1) require. The Court accordingly deems those facts admitted. Davis's objections under Fed. R. Civ. P. 56(d), premised on then-open discovery, do not alter the Court's treatment of the parties' fact statements.[33] Rule 56(d) relief requires a supporting affidavit

[30] Doc. 78 at 8–11.
[31] Doc. 90 at 4 ¶ 15.
[32] Doc. 90 at 4–5 ¶¶ 13, 16–17.
[33] Doc. 78 at 3–5, 7.

or declaration identifying the facts sought and explaining why they cannot be presented; Davis filed none, resting the objections on assertions in her brief. In any event, she cross-moved for summary judgment on the same record and filed no reply. And when she later moved, without opposition, to stay the case deadlines, she did not ask to extend or reopen discovery; Magistrate Judge Wieland left the deadlines for completing discovery and serving expert disclosures undisturbed, and discovery closed on May 28, 2026, without any renewed request.[34]

## III. ANALYSIS

The motions present six questions: (1) whether Davis has Article III standing; (2) whether NCS is a "debt collector" subject to the FDCPA; (3) whether NCS violated § 1692e(8); (4) whether Count II under § 1692f requires separate adjudication; (5) whether the *bona fide* error defense shields NCS from liability; and (6) whether NCS may seek attorney's fees. The Court takes each in turn.

### A. Davis Has Article III Standing.

NCS's motion argued that Davis suffered no concrete injury and could not establish causation.[35] In responding to the cross-motion, NCS states it "will concede to Plaintiff's standing to avoid re-litigating this threshold issue."[36] But standing is jurisdictional, so the Court must satisfy itself that Davis has carried her burden at this stage regardless of the concession; and at summary judgment she must do so with evidence, not allegations. *See Shields v. Prof'l Bureau of Collections of Md., Inc.*, 55 F.4th 823, 827 (10th Cir. 2022) (a "violation of a legal entitlement alone is insufficient" (quoting *Laufer v. Looper*, 22 F.4th

[34] Doc. 91; Doc. 92.
[35] Doc. 73 at 5–8.
[36] Doc. 90 at 6.

871, 878 (10th Cir. 2022)); the plaintiff must show a concrete injury in fact, fairly traceable to the challenged conduct, and redressable by a favorable decision); *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424–27 (2021); *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338–41 (2016).

Davis has done so. At the pleading stage, this Court held that Davis stated a tangible injury in fact by alleging she "spent additional time, effort, and expense informing Defendant (a second time) that her debt was disputed."[37] That theory is now supported by uncontroverted record evidence: Davis attests that NCS's reporting of the debt without a disputed notation forced her to spend additional time and effort, and about $260 in expense, having her attorneys reassert her dispute in the August 27, 2024, letter.[38] Monetary loss and time spent responding to a debt collector's failure to honor a dispute are concrete, particularized injuries. *See Mack v. Resurgent Cap. Servs., L.P.*, 70 F.4th 395, 405–07 (7th Cir. 2023); *Ebaugh v. Medicredit, Inc.*, No. 24-1838, 2025 WL 1088077, at *1 (8th Cir. Apr. 11, 2025) (unpublished) (per curiam) (time, effort, and postage spent responding to a collector's improper communication is a concrete injury where the consumer was "fixing [a] problem [the] debt collector created").

Davis's intangible reputational injury independently supports standing. An intangible harm is concrete when it bears a "close relationship" in kind—not degree—to a harm traditionally recognized at common law. *Lupia v. Medicredit, Inc.*, 8 F.4th 1184, 1191–92 (10th Cir. 2021); *TransUnion*, 594 U.S. at 424–25 (identifying "reputational harms" among traditionally recognized intangible injuries). And here, unlike a claim resting on a collector's internal records, NCS published the unflagged tradeline to a third

[37] Doc. 53 at 6.
[38] Doc. 78 at 11 ¶ 16 (deemed admitted); Doc. 80-9, Davis Decl. ¶ 9; Doc. 1-5.

party—TransUnion—which included it in Davis's credit report.[39] That publication of derogatory, incomplete credit information closely parallels the harm redressed by common-law defamation. *See Wood v. Sec. Credit Servs., LLC*, 126 F.4th 1303, 1309–11 (7th Cir. 2025) (holding, after *TransUnion*, that a collector's unflagged reporting of a disputed debt to a credit bureau inflicts a concrete reputational injury analogous to defamation); *Ewing v. MED-1 Sols., LLC*, 24 F.4th 1146, 1153–54 (7th Cir. 2022) ("being portrayed as a deadbeat who does not pay her debts has real-world consequences"); *Brady v. Midland Credit Mgmt., Inc.*, No. 24-2110-JAR, 2025 WL 2240852, at *5–8 (D. Kan. July 30, 2025) (finding standing on a defamation analogue for an identical § 1692e(8) claim where the collector communicated the unflagged debt to a credit bureau); *cf. Thomas v. LVNV Funding, LLC*, 132 F.4th 992, 994–95 (7th Cir. 2025) (*Ewing* does not create a categorical rule; a consumer alleging delayed reporting of a dispute must prove injury on the record); *Dotson v. AWA Collections*, Nos. 22-6078, 22-6096, 2023 WL 3055574, at *4 (10th Cir. Apr. 24, 2023) (unpublished) (characterizing § 1692e(8) claims as "akin to torts" in holding such claims unassignable under Oklahoma law).

NCS's contrary arguments do not persuade. Its observation that Davis's counsel have filed similar FDCPA actions for other clients[40] speaks to counsel's practice, not to whether this plaintiff suffered this injury, which the uncontroverted record establishes she did. *Lemons v. Portfolio Recovery Assocs., LLC*, No. CIV-23-600-SLP, 2024 WL 3571751, at *3–4 (W.D. Okla. July 29, 2024), on which NCS relies, did dismiss a similar suit for lack of standing, but on a record materially different from this one. The plaintiff there effectively conceded she relied solely on intangible harm, and the recorded call on

[39] Doc. 78 at 10 ¶ 14; Doc. 73 at 4 ¶ 9; Doc. 80-9, Davis Decl. ¶ 8.
[40] Doc. 73 at 6–7.

which she rested her dispute showed she had never actually disputed the debt. Finding the jurisdictional question intertwined with the merits, the court held the § 1692e(8) claim failed as a matter of law and dismissed for lack of standing, expressly declining to decide whether her asserted harm was concrete. *Id.* at *4–5 (describing the injury as speculative in dicta). Here, by contrast, the dispute letter, its transmission to NCS's collection agent, and Davis's out-of-pocket response are all established, largely by NCS's own statement of facts. Nor does the degree of harm matter to standing; NCS's argument that less than two months of misreporting "could cause little, if any, possible harm"[41] confuses the merits of damages with the existence of injury. *Lupia*, 8 F.4th at 1192; *Mack*, 70 F.4th at 406 ("An argument that the defendant harmed the plaintiff only once is not an argument that the plaintiff was not harmed."). Finally, traceability and redressability are straightforward: NCS furnished the tradeline, and the FDCPA provides actual and statutory damages. 15 U.S.C. § 1692k(a).

The Court does not rest standing on Davis's emotional distress alone, which would be insufficient in this Circuit. *See Cooper v. US Dominion, Inc.*, No. 22-1361, 2023 WL 8613526, at *5 (10th Cir. Dec. 13, 2023) (unpublished); *Sims v. Kahrs Law Offices, P.A.*, No. 22-2112-JWB, 2023 WL 2734317, at *7–9 (D. Kan. Mar. 31, 2023). Both Davis's tangible expenditure of time and money and the published reputational injury suffice. The Court finds Davis has Article III standing; her cross-motion is granted, and NCS's motion denied, on that ground.

[41] Doc. 73 at 3.

**B. NCS Is a "Debt Collector" Under 15 U.S.C. § 1692a(6).**

The FDCPA regulates only "debt collectors." *See Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 559 U.S. 573, 576–77 (2010). The statute defines the term in the disjunctive: a "debt collector" is "any person who uses any instrumentality of interstate commerce or the mails in any business *the principal purpose of which is the collection of any debts*, or who *regularly* collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another." 15 U.S.C. § 1692a(6) (emphasis added). The Tenth Circuit has recognized that Congress "intended the 'principal purpose' prong … to differ from the 'regularly' prong." *James v. Wadas*, 724 F.3d 1312, 1317 (10th Cir. 2013) (quoting *Garrett v. Derbes*, 110 F.3d 317, 318 (5th Cir. 1997)).

NCS's argument that it is Davis's "creditor," and therefore not a debt collector, rests entirely on *Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 82–85 (2017).[42] *Henson* held that a debt buyer collecting purchased debts for its own account does not satisfy the *second* definitional prong because such debts are not "owed … another." 582 U.S. at 83–85. But *Henson* left open the question this case presents. The Court acknowledged the Act's alternative "principal purpose" definition of debt collector, but expressly declined to decide whether Santander satisfied it, explaining that the parties "haven't much litigated that alternative definition and in granting certiorari we didn't agree to address it either." *Id.* at 82 (citation omitted). Davis's cross-motion does not rely on the "regularly collects … another" prong. She proceeds under the principal-purpose prong, and NCS's briefing never engages it.[43] NCS's only response is that Davis's

[42] Doc. 73 at 9–11; Doc. 90 at 6.
[43] Doc. 78 at 22–24. NCS's response does not mention the principal-purpose definition. *See generally* Doc. 90.

authorities are "not binding."[44] The observation is accurate but resolves nothing: the debt-collector question turns on the text of § 1692a(6).

Measured against that text, the undisputed facts permit only one conclusion. NCS stipulated that more than ninety-five percent of its 2023–2024 revenue derived from the purchase and liquidation of accounts characterized as defaulted consumer debts at the time of purchase; roughly seventy of its eighty employees are "debt collectors"; and it acknowledged in a state consent order it had operated a collection service business in Tennessee without the required license.[45] NCS plainly uses the mails and instrumentalities of interstate commerce in that business—through its collection agent's letters, emails, and calls, and its own furnishing of tradelines to a national credit bureau.[46] A business that exists to buy defaulted consumer debts and liquidate them is a business "the principal purpose of which is the collection of any debts." 15 U.S.C. § 1692a(6).

Every court of appeals to reach the principal-purpose question after *Henson* agrees. *See Tepper v. Amos Fin., LLC*, 898 F.3d 364, 371 (3d Cir. 2018) ("an entity whose principal purpose of business is the collection of any debts is a debt collector regardless whether the entity owns the debts it collects"); *Barbato v. Greystone All., LLC*, 916 F.3d 260, 265–69 (3d Cir. 2019); *McAdory v. M.N.S. & Assocs., LLC*, 952 F.3d 1089, 1090–94 (9th Cir. 2020); *Reygadas v. DNF Assocs., LLC*, 982 F.3d 1119, 1121–25 (8th Cir. 2020).

The Court finds this uniform authority persuasive and consistent with *James v. Wadas*'s instruction that the prongs are distinct. NCS's cases describing "creditor" and "debt collector" as "mutually exclusive," *e.g.*, *Berg v. Frobish*, No. 12-1123-KHV-KGG, 2012 WL 5586781, at *5 (D. Kan. Nov. 15, 2012), predate *Henson* and do not address the

---

[44] Doc. 90 at 6.
[45] Doc. 78 at 8–9 ¶¶ 2–4; Doc. 80-6, Guadagna Dep. 17:5–18:21; Doc. 80-7 at 2; Doc. 80-8 at 4–6.
[46] Doc. 78 at 9–10 ¶¶ 9, 12, 14.

principal-purpose prong; as *Barbato* explains, an entity may own a debt and yet be a debt collector because collection is its business's principal purpose. 916 F.3d at 266–69.

The remaining statutory elements are likewise established without genuine dispute: Davis is a "consumer"—a natural person allegedly obligated to pay a debt—under 15 U.S.C. § 1692a(3), and her Western Shamrock loan, taken out for personal living expenses, is a "debt" under § 1692a(5).[47] Summary judgment is granted to Davis, and denied to NCS, on NCS's status as a debt collector subject to the FDCPA.

### C. NCS Violated § 1692e(8) as a Matter of Law.

Section 1692e prohibits a debt collector from using "any false, deceptive, or misleading representation or means in connection with the collection of any debt." Among the practices the section enumerates as violations is "[c]ommunicating or threatening to communicate to any person credit information which is known or which should be known to be false, including the failure to communicate that a disputed debt is disputed." 15 U.S.C. § 1692e(8). The Tenth Circuit has treated a collector's reporting of a debt without noting a known dispute as actionable under this provision. *See Dixon v. RJM Acquisitions, LLC*, 640 F. App'x 793, 794 (10th Cir. 2016) (unpublished) (reversing summary judgment for the collector where a genuine issue existed as to whether the reported debt was disputed); *see also Brady v. Credit Recovery Co.*, 160 F.3d 64, 66–67 (1st Cir. 1998) (construing the same duty to disclose a debt's disputed status).

The parties agree NCS communicated credit information about Davis to TransUnion in July 2024, and failed to communicate that the debt was disputed.[48] The only contested element is knowledge: whether the debt was, to NCS's knowledge,

---

[47] Doc. 78 at 11 ¶ 18.
[48] Doc. 78 at 10 ¶ 14; Doc. 73 at 4 ¶ 9.

"disputed" when NCS reported it. NCS says it never received Davis's June 19, 2024, letter because Rockland did not forward it.[49] That is beside the point because Rockland's knowledge is imputed to NCS.

Because the FDCPA is a federal statute, the Court looks to federal common-law agency principles, which follow the Restatement (Third) of Agency. *See Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 739–40 (1989) (statutory terms carrying a settled common-law meaning are presumed to bear that meaning, and courts give them content by reference to the general common law of agency rather than the law of any particular State); *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 322–23 & n.3 (1992) (reaffirming *Reid* and adopting the common-law agency test for an undefined statutory term). Neither party contends that any other body of agency law would produce a different result here. Agency turns on the principal's right of control—not its actual exercise. Restatement (Third) of Agency § 1.01 cmt. c (Am. L. Inst. 2006) ("A principal's failure to exercise the right of control does not eliminate it ...."); *see Alfaro-Huitron v. Cervantes Agribusiness*, 982 F.3d 1242, 1253–54 (10th Cir. 2020) (applying New Mexico law and identifying the rights to assess the agent's performance, give interim instructions, and terminate the relationship as hallmarks of agency (quoting Restatement (Third) of Agency § 1.01 cmt. f(1))).

Each hallmark is present, and admitted, here: NCS retained Rockland to collect the Davis debt on NCS's behalf; capped Rockland's settlement authority and reserved approval over larger discounts; reserved audit rights, recall "for any reason," and termination; and it expressly concedes that it "had the right of oversight and control over

[49] Doc. 73-1, Guadagna Decl. ¶¶ 9–10.

the debt collection activity Rockland performed on NCS's behalf."[50] Rockland held itself out to Davis as "authorized by" NCS, with NCS's contractual blessing to act "consistent with the image and reputation of" NCS.[51] Rockland was NCS's agent for collection of this debt.[52]

"[N]otice of a fact that an agent knows or has reason to know is imputed to the principal if knowledge of the fact is material to the agent's duties to the principal," subject to exceptions not implicated here. Restatement (Third) of Agency § 5.03 (Am. L. Inst. 2006); *see Schmitt v. FMA All.*, 398 F.3d 995, 997–98 (8th Cir. 2005) (recognizing in an FDCPA case that under "established agency law … the knowledge of the agent is imputed to the principal," while declining to impute a creditor's knowledge to its collection agency). Materiality is not in question: receipt and handling of consumer dispute and attorney-representation notices fell squarely within Rockland's duties—the parties' contract obligated Rockland to "immediately provide" NCS with "information on any notice received from a 3rd party" concerning NCS's accounts, "including but not limited to … attorney representation [and] legal action."[53]

Two features of the imputation rule answer NCS's argument directly. A principal "may not rebut the imputation of an agent's notice of a fact by establishing that the agent

---

[50] Doc. 81 §§ IV–VIII; Doc. 78 at 9 ¶ 8; Doc. 90 at 3 ¶ 8.
[51] Doc. 78 at 9 ¶ 9; Doc. 81 § IX.a.
[52] The Agreement also recites that Rockland "is acting as an independent contractor and is solely responsible for the employment, acts and omissions, control and direction of its employees," and that no action or agreement between the parties "shall constitute a partnership or joint venture." (Doc. 81 § IX.f.) Neither party invokes this provision, and it does not alter the analysis. Independent-contractor status and agency are not mutually exclusive, and the parties' label is not controlling where the elements of agency are otherwise present. *See Alfaro-Huitron*, 982 F.3d at 1256 ("an independent contractor may be an agent even if it is not an employee"); Restatement (Third) of Agency § 1.02 cmt. b (Am. L. Inst. 2006) (an agreement "may negatively characterize the relationship as not one of agency," but such a statement is "not determinative" and "does not preclude the relevance of other indicia of consent"). NCS's admitted right of oversight and control supplies those elements here. (Doc. 90 at 3 ¶ 8.)
[53] Doc. 81 § IX.d.

kept silent." Restatement (Third) of Agency § 5.03 cmt. b (Am. L. Inst. 2006). And an organization is "treated as possessing the collective knowledge of [its] … agents, when that knowledge is material to the agents' duties, however the organization may have configured itself or its internal practices for transmission of information." *Id.* cmt. c. Rockland's silence therefore does not defeat imputation, and neither does the absence of any mechanism for routing agent-received disputes to NCS.

And receipt is established by NCS's own submissions: NCS's statement of facts asserts "Plaintiff's attorney sent a debt dispute letter to Rockland Resource on or about June 19, 2024, questioning the 'correctness of the debt,'" and its declarant attests the letter "was never forwarded to NCS," a formulation that presupposes Rockland had it.[54] Given these concessions, the Court need not resolve NCS's hearsay objection to Davis's email-tracking evidence.[55] Nor could Rockland avoid the consequences of the letter by declining to read it: a collector "is still charged with knowledge of the information" in its own records, *Young v. NPAS, Inc.*, 361 F. Supp. 3d 1171, 1186 (D. Utah 2019), and a collector cannot avoid that knowledge by ceasing to monitor a channel it holds open for consumer communications, *see Ewing*, 24 F.4th at 1155 ("It was not reasonable for Receivables to stop monitoring its fax inbox while allowing the system to continue sending confirmations that faxes had been received.").

NCS's theory that Rockland was "temporarily defunct" fails on NCS's own evidence. Guadagna places Rockland's reopening "sometime in June 2024," and Rockland's own account notes fix the date more precisely: an entry of June 10, 2024,

---

[54] Doc. 73 at 4 ¶ 6; Doc. 73-1, Guadagna Decl. ¶ 9.
[55] Doc. 90 at 3 ¶ 10 (objecting to ¶ 10 of Davis's statement of additional facts as inadmissible hearsay on the ground that it rests on a declaration by a paralegal at Davis's counsel's firm and a report she generated); Doc. 80-1, Corbett Decl. ¶¶ 6–10 & Ex. A (Mailjet records reflecting delivery and opening of the June 19, 2024, email). The Court expresses no view on the objection.

records the account "Open for work!"—nine days before the dispute email arrived. NCS further admits Rockland actively collected from Davis on NCS's behalf in July and August 2024, the very window in which NCS furnished the unflagged tradeline.[56] Rockland's spring status does not change what matters here: NCS's agent was operating, and collecting this debt, when the dispute arrived and when NCS reported. Nor was Rockland's actual authority terminated before the dispute arrived: NCS did not recall the account until about October 2024.[57] And Rockland dealt with Davis with apparent authority in any event. NCS placed the account with Rockland for collection and authorized it to deal with Davis on NCS's behalf, and Rockland's letter told Davis it was "authorized by" NCS. That manifestation is traceable to NCS, and apparent authority suffices for imputation on its own. Restatement (Third) of Agency § 5.03 cmt. f (Am. L. Inst. 2006). Drawing all reasonable inferences in NCS's favor, no reasonable jury could find that the dispute was outside the knowledge chargeable to NCS in July 2024.

The result would be the same under § 1692e(8)'s own terms. The provision reaches credit information "which should be known to be false," and the Seventh Circuit has explained this language "creates a negligence standard" that "holds debt collectors to a duty of reasonable care not to report false information." *Wood*, 126 F.4th at 1312–13. NCS identified nothing it did to learn whether disputes were reaching the agent it kept on the account, even as that agent collected through the summer.[58] And NCS reserved the credit-reporting function to itself: the Agreement barred Rockland from furnishing any account information to a credit reporting agency without NCS's express written permission.[59] NCS

[56] Doc. 90 at 3 ¶¶ 7–8; Doc. 73-1, Guadagna Decl. ¶ 8; Doc. 81-1 at A000014; Doc. 78 at 10 ¶ 12.
[57] Doc. 78 at 10–11 ¶ 15.
[58] Doc. 73-1, Guadagna Decl. ¶¶ 6–10; Doc. 78 at 10 ¶ 12.
[59] Doc. 81 § XI.d.

at a minimum should have known of the dispute when it furnished the July 2024 tradeline.

This conclusion is consistent with *Midland Credit*, where the court denied the consumer summary judgment on an identical § 1692e(8) claim because the collector, despite receiving the dispute letters, could not associate them with the consumer's accounts, leaving for the jury whether it should have known of the dispute. *Midland Credit*, 2025 WL 2240852, at *9. No comparable factual gap exists here: Rockland held the Davis account and was actively collecting it, NCS's own statement of facts concedes that the dispute letter reached Rockland, and the dispute was accordingly within the knowledge chargeable to NCS as a matter of law.

The misrepresentation was also material. An inaccurate credit report is "a red flag to the debtor's other creditors and anyone who runs a background or credit check, including landlords and employers." *Evans v. Portfolio Recovery Assocs., LLC*, 889 F.3d 337, 345 (7th Cir. 2018) (quoting *Phillips v. Asset Acceptance, LLC*, 736 F.3d 1076, 1082 (7th Cir. 2013)), abrogated on other grounds by *TransUnion*, 594 U.S. 413, as recognized in *Ewing*, 24 F.4th at 1152. And "the failure to inform a credit reporting agency that the debtor disputed his or her debt will *always* have influence on the debtor, as this information will be used to determine the debtor's credit score." *Evans*, 889 F.3d at 349. NCS knew or should have known the omission rendered the reported information false. *See Wood*, 126 F.4th at 1312–13. Accordingly, Davis is entitled to summary judgment on liability under § 1692e(8), and NCS's motion is denied as to Count I.

### D. Count II (§ 1692f) Will Not Be Separately Adjudicated.

Count II alleges that the same conduct—reporting the disputed debt without a dispute notation—was "unfair or unconscionable" under 15 U.S.C. § 1692f.[60] Neither party briefs § 1692f as an independent theory; each treats it as rising or falling with Count I. Because Count II rests on conduct fully redressed by Count I, and because additional statutory damages under § 1692k(a)(2)(A) are capped per action rather than per violation, resolving Count II would not alter the relief available to Davis. *See* 15 U.S.C. § 1692k(a)(2)(A) ("in the case of any action by an individual, such additional damages as the court may allow, but not exceeding $1,000"). The Court therefore denies both motions without prejudice as to Count II and will take up at the forthcoming status conference whether Count II should be dismissed as duplicative or otherwise resolved before trial.

### E. The *Bona Fide* Error Defense Fails as a Matter of Law.

The FDCPA's *bona fide* error provision shields a debt collector from liability if it "shows by a preponderance of evidence that the violation was not intentional and resulted from a *bona fide* error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error." 15 U.S.C. § 1692k(c).[61] The defense has three elements: the violation must be (1) unintentional, (2) a *bona fide*—that is, genuine, good-faith—error, and (3) one that occurred despite procedures reasonably adapted to avoid the specific error at issue. *Johnson v. Riddle*, 443 F.3d 723, 727–29 (10th Cir. 2006), overruled in part on other grounds by *Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 559 U.S. 573, 604–05 (2010); *Lupia*, 8 F.4th at 1194–98. The "procedures"

---

[60] Doc. 1 ¶¶ 20–23.

[61] NCS's memorandum cites the defense as "15 U.S.C. § 1692c(c)" (Doc. 73 at 12); the Court construes the reference as § 1692k(c), the provision NCS elsewhere correctly invokes.

element requires "processes that have mechanical or other such 'regular orderly' steps to avoid mistakes." *Jerman*, 559 U.S. at 587. General evidence of policies, and blanket assertions that they were reasonably adapted, do not suffice; the collector must show how its procedures were adapted to avoid the specific error. *Lupia*, 8 F.4th at 1197. NCS bears the burden of proof on each element.

Because Davis's cross-motion pointed to the absence of evidence supporting the defense,[62] Rule 56 required NCS to come forward with record evidence on each element. Fed. R. Civ. P. 56(c)(1), (e); *Celotex*, 477 U.S. at 325. On the dispositive procedures element, NCS produced none. Its summary-judgment evidence on this defense consists of a single declaration stating that the June 2024 letter "was never forwarded to NCS" and that NCS received no dispute correspondence before suit.[63] The declaration describes no procedure of any kind—nothing about how NCS processes disputes, oversees its collection agents, ensures agent-received notices reach NCS, or verifies the accuracy of the tradelines it furnishes—and it offers no account of how or why the claimed error occurred. NCS's brief asserts it "maintains reasonable procedures" and "would have followed such procedures here,"[64] and its response names two policies said to have been "produced to Plaintiff" in discovery: "Furnishing Data/Information to Credit Reporting Agency" and "Data Furnisher Accuracy & Integrity."[65] But neither policy is in the summary-judgment record. Assertions in a brief are not evidence, and a party opposing summary judgment on a defense it must prove cannot rest on a representation that supporting documents exist somewhere in discovery. Fed. R. Civ. P. 56(c)(1)(A); *see Est. of Hurtado v. Smith*,

[62] Doc. 78 at 28–33.
[63] Doc. 73-1, Guadagna Decl. ¶¶ 9–10.
[64] Doc. 73 at 12.
[65] Doc. 90 at 7.

119 F.4th 1233, 1238 (10th Cir. 2024) ("Summary judgment requires more than mere speculation." (quoting *Self v. Crum*, 439 F.3d 1227, 1235 (10th Cir. 2006))).

Even had the policies been filed, NCS would still need to show they were "reasonably adapted" to avoid the specific error at issue—the failure of a dispute received by NCS's collection agent to be transmitted to NCS and reflected in its credit reporting. *Lupia*, 8 F.4th at 1197–98; *see Isham v. Gurstel, Staloch & Chargo, P.A.*, 738 F. Supp. 2d 986, 999–1000 (D. Ariz. 2010) (granting the consumer partial summary judgment where the collector explained its compliance procedures "in detail" but failed to show they "actually addressed the relevant error in practice"). Nor does the deposition testimony that a handful of NCS employees "do disputes" fill the gap.[66] The existence of a dispute department says nothing about how, or whether, disputes received by NCS's collection agents make their way to NCS at all.

NCS's failure of proof is not the only problem; the uncontroverted facts affirmatively undercut the defense: NCS placed the account with an agency that had been formed barely two months before it applied for the business and that told NCS it was still setting up its operations; identified no oversight mechanism for the period it now claims Rockland was "defunct"; never informed the consumer of any disruption; left the account with Rockland until October 2024; and furnished the unflagged tradeline in July 2024 while its agent was actively collecting.[67] On this record, no reasonable jury could find that NCS maintained procedures reasonably adapted to avoid this error, and the Court therefore need not reach the first two elements. Unlike in *Midland Credit*, where the collector's corporate-representative testimony describing its account-association

[66] Doc. 80-6, Guadagna Dep. 18:22–19:3.
[67] Doc. 78 at 9–11 ¶¶ 6, 12–15.

procedures created genuine disputes requiring trial, the failure here is one of proof, not a premature weighing of reasonableness: NCS placed no evidence of any procedure before the Court. *See Midland Credit*, 2025 WL 2240852, at *10–11 (denying both parties summary judgment on the defense where record evidence of the collector's procedures supported competing inferences). Davis is entitled to summary judgment on the § 1692k(c) defense, and NCS's motion is denied as to the defense.

**F. NCS's Request for Leave to Seek Attorney's Fees Is Denied.**

NCS asks for leave to seek attorney's fees and costs under 15 U.S.C. § 1692k(a)(3), which permits a fee award against a plaintiff only "[o]n a finding by the court that an action under this section was brought in bad faith and for the purpose of harassment."[68] Davis has not merely survived summary judgment; she has prevailed on liability. There is no basis for a bad-faith or harassment finding, and the request is denied.

## IV. CONCLUSION AND ORDER

**IT IS THEREFORE ORDERED BY THE COURT** that Defendant's Motion for Summary Judgment (Doc. 72) is **DENIED**, except that, as to Count II (§ 1692f), it is **DENIED WITHOUT PREJUDICE**.

**IT IS FURTHER ORDERED** that Plaintiff's Cross-Motion for Summary Judgment (Doc. 77) is **GRANTED IN PART AND DENIED IN PART**. The motion is granted as to Plaintiff's Article III standing; as to Defendant's status as a "debt collector" under 15 U.S.C. § 1692a(6); as to Defendant's liability under 15 U.S.C. § 1692e(8) (Count I); and as to Defendant's *bona fide* error defense under 15 U.S.C. § 1692k(c), which is

[68] Doc. 73 at 12; Doc. 90 at 7–8.

rejected as a matter of law. The motion is denied without prejudice as to Count II (§ 1692f), which the Court will address at the status conference as set out below.

**IT IS FURTHER ORDERED** that Defendant's request for leave to seek attorney's fees and costs under 15 U.S.C. § 1692k(a)(3) is **DENIED**.

The case will proceed to trial on Plaintiff's damages under 15 U.S.C. § 1692k(a), on which Plaintiff has demanded a jury. Consistent with Magistrate Judge Wieland's April 13, 2026, order (Doc. 92), counsel for the parties shall contact the chambers of Magistrate Judge Wieland within seven (7) days of this Order to schedule a status conference, at which the Court expects to reset the pretrial-order deadline, the deadline for motions challenging the admissibility of expert testimony, the pretrial conference, and a trial setting, and to address the disposition of Count II and whether, in light of this Order, renewed mediation or a settlement conference before Magistrate Judge Wieland would be productive.

**IT IS SO ORDERED.**

Dated this 17th day of August, 2026, at Topeka, Kansas.

*s/ Anthony W. Mattivi*
Anthony W. Mattivi
United States District Judge